UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | 1:12-cv-1376-JMS-TAB |
| U.S. DRY CLEANING SERVICES CORPORATION d/b/a TUCHMAN CLEANERS, | ) ) ) ) | |
| Defendant. | ) | |

**ORDER**

Plaintiff Equal Employment Opportunity Commission ("EEOC") brings this race discrimination suit against Defendant U.S. Dry Cleaning Services Corporation d/b/a Tuchman Cleaners ("USDC"), alleging violations of Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. §§ 2000e et seq. ("Title VII") and Title I of the Civil Rights Act of 1991. [Filing No. 1.] Currently pending before the Court is USDC's Motion for Partial Summary Judgment which seeks an entry of judgment in favor of USDC on the EEOC's punitive damage claim. [Filing No. 54.] For the reasons that follow, the Court **DENIES** USDC's Motion for Partial Summary Judgment.

**I.**
**SUMMARY JUDGMENT STANDARD OF REVIEW**

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). As the current version of Rule 56 makes clear, whether a party asserts that a fact is undisputed or genuinely disputed, the party must

1

support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B). Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated. Fed. R. Civ. P. 56(c)(4). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009). In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome determinative. *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005). Fact disputes that are irrelevant to the legal question will not be considered. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003). The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008). It cannot weigh evidence or make credibility

2

determinations on summary judgment because those tasks are left to the fact-finder. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011). The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has "repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them," *Johnson*, 325 F.3d at 898. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Ponsetti v. GE Pension Plan*, 614 F.3d 684, 691 (7th Cir. 2010).

## II.
### BACKGROUND

The following facts are stated consistent with the foregoing standard, that is, with all reasonable inferences in favor of the EEOC. Mr. Brisco Palmer ("Palmer") was hired at the Tuchman Dry Cleaners Zionsville Location ("Tuchman Zionsville") in 2006. [Filing No. 57-7 at 3.] In 2008, USDC purchased Tuchman Dry Cleaners ("Tuchman") and became Mr. Palmer's employer. [Filing No. 56-3 at 7.] From August 28, 2006, until June 14, 2011, Mr. Palmer was officially hired as a dry cleaning presser. [Filing No. 57-3 at 3; Filing No. 57-7 at 3-8.] On May 19, 2011, Mr. Palmer filed a charge of race discrimination with the EEOC alleging that USDC failed to promote him to the position of assistant manager at Tuchman Zionsville because of his race- African American. [Filing No. 56-6 at 7.]

Ms. Tonya Wentzel ("Wentzel") was the store manager at Tuchman Zionsville during all relevant times. [Filing No. 57-6 at 4.] Mr. Alex Cvetkovich ("Cvetkovich") was the district manager covering Tuchman Zionsville during all relevant times and was Ms. Wentzel's immediate supervisor. [Filing No. 57-5 at 3; Filing No. 57-6 at 7.] Mr. James Dunn ("Dunn") was the regional manager at USDC from October 2008-June 2011, [Filing No. 56-3 at 7], and was Mr. Cvetkovich's immediate supervisor during that time, [Filing No. 57-5 at 4].

### A. The Failure to Promote—June 2010 – May 2011

USDC protocol usually requires that an applicant for an assistant manager position be interviewed first by the store manager, then by the district manager, and finally by the regional manager. [Filing No. 56-4 at 3.] Mr. Dunn, as regional manager, had the final say on who was promoted to assistant manager at Tuchman Zionsville. [Filing No. 56-5 at 2.] Although USDC filed for bankruptcy in March 2010, [Filing No. 57-2 at 16], Mr. Dunn was still allowed "to hire and promote as needed . . . to preserve the assets" during bankruptcy, [Filing No. 57-4 at 5].

Mr. Palmer was hired as a dry cleaning presser at Tuchman Zionsville in 2006, [Filing No. 57-7 at 3; Filing No. 57-7 at 7], but, in July 2010, Ms. Wentzel began training Mr. Palmer for the assistant manager position, [Filing No. 57-7 at 10-14]. The previous assistant manager had quit a few weeks prior, and Ms. Wentzel agreed with Mr. Palmer that he would be a good replacement. [Filing No. 57-7 at 11-12.] Ms. Wentzel discussed Mr. Palmer's promotion with Mr. Cvetkovich, and Mr. Cvetkovich said that Mr. Palmer would get promoted to assistant manager "as soon as we could." [Filing No. 57-5 at 11.] He allowed Ms. Wentzel to begin training Mr. Palmer. [Filing No. 57-6 at 9.]

Mr. Cvetkovich asked Mr. Dunn about Mr. Palmer's promotion on a monthly basis beginning in summer 2010, which was roughly five or six times.[1] [Filing No. 57-5 at 9-10.]

---

[1] There are issues of fact concerning Mr. Palmer's training, but of course at this juncture they must be resolved in the EEOC's favor. While Mr. Cvetkovich asserted that Mr. Dunn was aware of the training, [Filing No. 57-5 at 12-13], Mr. Dunn claimed to have had no idea that Mr. Palmer began training in July 2010, [Filing No. 56-3 at 4]. Mr. Dunn said he did not have any conversations with Mr. Cvetkovich about Mr. Palmer's promotion to assistant manager before January 2011. [Filing No. 56-3 at 6.] In January 2011, Mr. Dunn asked Mr. Cvetkovich about Mr. Palmer's qualifications. [Filing No. 56-3 at 5-6.] After Mr. Cvetkovich responded, Mr. Dunn said: "[B]ased on that . . . I can't allow you to promote him to assistant manager at this time. He did not give me enough information that would indicate that [Mr.] Palmer was in a position at that point in time to be named, and it was not asked to be put in training, it was asked

4

Each time, Mr. Dunn told him that they had to wait until USDC was cleared out of bankruptcy.[2] [Filing No. 57-5 at 9-10.] Mr. Palmer was not informed that Mr. Dunn needed to approve his promotion. [Filing No. 57-7 at 13.] Instead, Mr. Cvetkovich explained to Mr. Palmer that "I was offering him the position, but I couldn't move him to that position until I got the okay. And that was going to be when we came out of bankruptcy." [Filing No. 57-5 at 16-17.]

Meanwhile, Ms. Wentzel taught Mr. Palmer how to perform most of the assistant manager duties, including the dry cleaning tasks and managerial paperwork, after two pressers were hired to fill Mr. Palmer's previous position as presser. [Filing No. 57-6 at 10; Filing No. 57-7 at 13-14]. She did not train Mr. Palmer in customer service, however, because she wanted him to receive an assistant manager's wage first.[3] [Filing No. 57-7 at 14-15.] For nearly two weeks throughout the summer Mr. Palmer ran Tuchman Zionsville while Ms. Wentzel was away on vacation or otherwise out of the store. [Filing No. 57-6 at 10-11; Filing No. 57-7 at 59-61.] He performed all assistant manager duties alone during those times except for the duties at the counter, which was handled by the cashier.[4] [Filing No. 56-6 at 12.]

Although Mr. Palmer originally agreed to perform assistant manager duties without an official promotion or a pay-raise upfront, he voiced his skepticism to Ms. Wentzel a month after his training began: "I just didn't understand why would they hire two people to do my job at $9 apiece. Figured that was $18, and the only thing I just needed was a dollar for me to start my

---

to be promoted to that and receive the pay increase. I said based on that, I have to deny the request at this time." [Filing No. 56-3 at 6.]

[2] Mr. Dunn denied telling Mr. Cvetkovich in January 2011 that he could not promote Mr. Palmer to assistant manager at Tuchman Zionsville because of bankruptcy or other financial concerns. [Filing No. 57-2 at 13.]

[3] An assistant manager earns one dollar an hour more than a dry cleaning presser. [Filing No. 57-7 at 18; Filing No. 57-8 at 7.]

[4] Ms. Wentzel gave Mr. Palmer a thirty-day review for his work as assistant manager but forgot to give him a sixty and ninety-day review. [Filing No. 57-6 at 13-14.] Mr. Palmer continued to perform assistant manager duties after ninety days of training. [Filing No. 57-6 at 14.]

5

tasks and duties." [Filing No. 57-7 at 18.] In September 2010, Mr. Palmer asked Mr. Cvetkovich when he would receive a pay raise for his work as assistant manager, and Mr. Cvetkovich replied that he was still waiting on paperwork and that the process was delayed due to USDC's bankruptcy. [Filing No. 57-7 at 19-20.]

In November 2010, Ms. Cynthia Elkins ("Elkins") was transferred to Tuchman Zionsville from another Tuchman location to fill the assistant manager position. [Filing No. 56-6 at 2; Filing No. 57-6 at 18-19.] Mr. Palmer continued to perform assistant manager duties after she arrived, [Filing No. 57-7 at 25], and did not realize that Ms. Elkins was the assistant manager until he saw her rate of pay while completing paperwork, [Filing No. 57-7 at 28-30]. Mr. Palmer first felt that he was being discriminated against on the basis of race when he saw this pay difference, but he did not notify anyone at USDC of these feelings.[5] [Filing No. 56-6 at 5.] A month after Ms. Elkins was hired, the pressers quit, and Mr. Palmer went back to pressing full time.[6] [Filing No. 56-6 at 3-4.]

Mr. Palmer talked first with Ms. Wentzel about Ms. Elkins' transfer and his demotion, and she promised to talk with Mr. Cvetkovich. [Filing No. 57-7 at 31.] After Ms. Wentzel discussed the matter with Mr. Cvetkovich, she told Mr. Palmer that he would receive a raise at the beginning of 2011. [Filing No. 57-7 at 32.]

---

[5] Mr. Palmer explained his silence: "I didn't want to just jump to conclusions. I'm the type of person that will hold stuff in until I have the facts." [Filing No. 56-6 at 5.]
[6] Mr. Cvetkovich said he transferred Ms. Elkins to replace Mr. Palmer as assistant manager at Tuchman Zionsville. [Filing No. 56-4 at 5.] "[W]e had intentions of him going to the assistant manager position. And we hired a presser to start pressing and to take [Mr. Palmer's] position so we would be able to get him going to assistant manager as soon as we got the okay. And we were doing that at the time, and then the presser that we hired for [Mr. Palmer] quit . . . I told [Mr. Palmer] he needed to keep doing what his job was, which was presser. And I had [Ms. Elkins] at Plainfield and didn't really need her there because it wasn't that busy at the time. And I moved her over there to help [Ms. Wentzel] at [Tuchman Zionsville]." [Filing No. 56-4 at 5.] He claimed that the transfer was not intended to be permanent but only "until we got [Mr. Palmer] going." [Filing No. 56-4 at 5.]

6

Ms. Elkins quit her job as assistant manager in April 2011. [Filing No. 57-5 at 23.] When Mr. Cvetkovich visited Tuchman Zionsville, Mr. Palmer asked him to explain why he had not gotten a raise, and "he always had a excuse far as money. First it was money. Then it went to he had to talk to [Mr.] Dunn." [Filing No. 56-6 at 5.] This was the first time that Mr. Palmer heard about Mr. Dunn's involvement in his promotion. [Filing No. 56-6 at 5.] After the assistant manager position had been vacant for two weeks, Mr. Palmer asked Ms. Wentzel what was the real reason he was not getting promoted to assistant manager. [Filing No. 56-6 at 6.] Visibly upset, Ms. Wentzel told Mr. Palmer that "she talked to [Mr. Cvetkovich], and [Mr. Cvetkovich] told her that [Mr.] Dunn don't believe that I'm the face for this store."[7] [Filing No. 56-6 at 7; *see also* Filing No. 57-8 at 6-7.] Mr. Palmer asked her what she meant, and she responded: "What do you think I mean by face for this store? Your skin color is not the right for this store, for this community." [Filing No. 56-6 at 7.] Without discussing the comment with anyone at USDC or asking again about his promotion and pay raise, Mr. Palmer filed a charge with the EEOC a couple weeks later. [Filing No. 56-6 at 7.]

**B. Post-EEOC Charge**

Shortly after USDC found out about Mr. Palmer's EEOC charge, Mr. Michael Washington ("Washington"), who had replaced Mr. Dunn as regional manager, Mr. Jeff Garrison ("Garrison"), another district manager, and Mr. Cvetkovich met with Mr. Palmer to discuss his discrimination charge. [Filing No. 56-7 at 2.] Shortly thereafter, Mr. Riaz Chauthani

---

[7] Mr. Dunn denied making this statement. [Filing No. 56-3 at 6; Filing No. 56-3 at 9-10.] Pursuant to the standard for summary judgment review, the Court will consider this admissible evidence in its determination. USDC acknowledges this is proper course. ("By referencing the remark regarding the 'face' of Tuchman Zionsville, USDC is not conceding that the comment is admissible, accurate, or that it was in fact made. But for the purposes of Summary Judgment, USDC understands that the Court must accept the remark as true." [Filing No. 55 at 2, fn 1.])

7

("Chauthani"), Mr. Washington's immediate supervisor, asked Mr. Palmer to drop the charges, offered him the assistant manager position, [Filing No. 57-7 at 48], and told him that he would receive a $525 check as back pay for the time he was performing assistant manager duties in 2010, [Filing No. 56-7 at 5]. Mr. Palmer was officially promoted to assistant manager on June 15, 2011. [Filing No. 57-3 at 3.]

## III.
### DISCUSSION

Title VII allows an award of punitive damages when the plaintiff "demonstrates that the defendant engaged in intentional discrimination 'with malice or with reckless indifference to the federally protected rights of an aggrieved individual.'" *Bruso v. United Airlines, Inc.*, 239 F.3d 848, 857 (7th Cir. 2001) (quoting 42 U.S.C. § 1981a(b)(1)). In *Kolstad v. American Dental Association*, the Supreme Court established a three-part framework for determining whether an award of punitive damages is proper under Title VII's standard. *Id.* First, the plaintiff must show that the employer acted with knowledge that its actions may have violated federal law. *Kolstad v. American Dental Association*, 527 U.S. 526, 535 (1999). Second, the plaintiff must impute liability to the employer. *Id.* at 539. Finally, even if the first two requirements are met, the employer may not be vicariously liable for the discriminatory actions of its managerial agents if the employer can show that those actions are contrary to the employer's "good-faith efforts to comply with Title VII." *Id.* at 545 (quoting *Kolstad v. American Dental Ass'n*, 139 F.3d 958, 974 (D.C. Cir. 1998) (Tatel, J., dissenting) (vacated, 527 U.S. 526).

### A. USDC acted with knowledge that its actions may have violated federal law.

To survive the first step of the *Kolstad* framework, the EEOC must demonstrate that USDC acted with 'malice' or 'reckless indifference,' or, in other words, with knowledge that its failure to promote Mr. Palmer may have violated federal law. *See Kolstad*, 527 U.S. at 535. The

8

required mental state refers to the employer's awareness that its actions are in violation of federal law, not that it is engaging in discrimination. *Id.* A plaintiff can satisfy this prong by "demonstrating that the relevant individuals knew of or were familiar with the antidiscrimination laws and the employer's policies for implementing those laws." *Bruso*, 239 F.3d at 858. Alternatively, a plaintiff may show that the employer acted with reckless disregard for the plaintiff's federally protected rights by "showing that the defendant's employees lied, either to the plaintiff or to the jury, in order to cover up their discriminatory actions." *Id.* The plaintiff has the burden of proof and must prove this element by a preponderance of the evidence. *E.E.O.C. v. AutoZone, Inc.*, 707 F.3d 824, 835 (7th Cir. 2013).

The evidence viewed in light most favorable to the EEOC shows that USDC acted with knowledge that its actions may have violated Title VII. Mr. Dunn was familiar with USDC's antidiscrimination policies and with Title VII. [Filing No. 56-3 at 7-8.] In 2008, Mr. Dunn attended an employment discrimination training session for "managers and above." [Filing No. 56-3 at 7.] Because his office was outside of the conference room where new employees underwent training, he attended almost all of the new employee orientation programs, which he claimed cover "all types of discrimination, sexual harassment, everything employees need to know." [Filing No. 56-3 at 7.] He considered himself "well grounded" in employment discrimination laws and USDC's employment discrimination policy. [Filing No. 56-3 at 7.] In *Bruso v. United Airlines, Inc.*, the Seventh Circuit found that the plaintiff satisfied this element when he demonstrated that the managers involved in the lawsuit were familiar with the antidiscrimination principles of Title VII and with the company's antidiscrimination policy. 239 F.3d at 859. One of the managers discussed the antidiscrimination policy with the supervisors several times, attended three training sessions on discrimination, and read the company's policy

9

and informational materials. *Id.* at 860; *see also* E.E.O.C. v. Caterpillar Inc., 503 F.Supp.2d 995, 1048 (N.D. Ill. 2007) ("There is ample evidence that managerial employees were aware of the risk that they might violate federal law, as reflected in Defendant's repeated and substantial efforts to train all employees on and publicize its harassment policies."); *Ciesielski v. Hooter Management Corp.* 2004 WL 2997648, *2 (N.D. Ind. 2004) (finding that the first element was satisfied when managers testified at trial that they attended sexual harassment seminars and annual training programs concerning sexual harassment and that they read the manual containing the company's policy).[8] Similarly, the EEOC has proven that Mr. Dunn was familiar with Title VII and USDC's antidiscrimination policy. Mr. Palmer was not required to make a formal complaint against Mr. Dunn to satisfy this first element because only Mr. Dunn's awareness that

---

[8] USDC relies on *AutoZone* to prove that because Mr. Palmer never complained to anyone at USDC that he was being discriminated against on the basis of his race, there is no evidence that it acted with malice or reckless disregard. [Filing No. 55 at 8-12.] In *AutoZone*, the court concluded that the employer had the required mental state to satisfy the first prong: "Because [the employee] repeatedly asked [the employer's lead disability coordinator] for an accommodation, and asked for an accommodation so often that [the coordinator] became frustrated by his persistence, a rational jury could have decided that AutoZone's response was not mere negligence, but reckless indifference." 707 F.3d at 837. *AutoZone* is an American with Disabilities ("ADA") case, however, which is distinguishable from a Title VII racial discrimination case. A claim for race discrimination under Title VII does not require proof that the employer complained of racial discrimination, while a claim for failure to accommodate under ADA does require proof that the employer was aware of the employee's need for accommodation. *See* McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973) (explaining that to establish a prima facie case of racial discrimination, the plaintiff must show: "(i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of [plaintiff's] qualifications."; Hoffman v. Caterpillar, Inc., 256 F.3d 568, 572 (7th Cir. 2001) ("[I]n addition to showing that she is a qualified individual with a disability, [the employee] must show that the employer was aware of her disability and still failed to reasonably accommodate it.").

he is acting in violation of federal law, not his awareness that he is engaging in discrimination, is relevant.[9] *See Kolstad*, 527 U.S. at 535.

### B. Mr. Dunn was in a managerial capacity, and USDC was vicariously liable for his actions.

Once the first element of the *Kolstad* framework is satisfied, the EEOC must impute liability for punitive damages to USDC. *See Kolstad*, 527 U.S. at 539. To impute liability, a plaintiff must show: "(a) the principal authorized the doing and the manner of the act, or (b) the agent was unfit and the principal was reckless in employing him, or (c) the agent was employed in a managerial capacity and was acting in the scope of employment, or (d) the principal or a managerial agent of the principal ratified or approved the act." *Id.* at 542-43 (quoting Restatement (Second) of Agency § 217C). Whether an employee is in a managerial capacity "is necessarily a fact-intensive inquiry, and the fact finder ought to consider the kind of authority the employer has given the employee, the amount of discretion given to the employee in executing his job duties, and the manner in which those duties are carried out." *Bruso*, 239 F.3d at 858. The employee should be important but does not need to be the top management or top company official. *Kolstad*, 527 U.S. at 543. USDC does not dispute that Mr. Dunn was a managerial agent acting within the scope of his employment when he did not promote Mr. Palmer. Accordingly, the EEOC has met is burden to establish that USDC was vicariously liable for Mr. Dunn's actions.

### C. USDC did not engage in good faith efforts to implement an anti-discrimination policy.

---

[9] The EEOC also argues that USDC's actions satisfy the first factor because they were egregious. [Filing No. 57 at 14-16.] The Court is satisfied that Mr. Dunn, and in turn USDC, acted with knowledge that its actions may violate federal law thus meeting the first factor of the *Kolstad* framework. Because this test is more developed in case law and the egregiousness standard is merely an alternative test to prove mental state, the Court will rely on it here. *See Bruso*, 239 F.3d at 858.

Even if the EEOC can satisfy the first two elements of the *Kolstad* framework, USDC "may not be vicariously liable for the discriminatory employment decisions of managerial agents where these decisions are contrary to the employer's 'good faith efforts to comply with Title VII.'" *Kolstad*, 527 U.S. at 545 (quoting *Kolstad v. American Dental Ass'n*, 139 F.3d 958, 974 (D.C. Cir. 1998) (Tatel, J., dissenting) (vacated, 527 U.S. 526)). The implementation of a written or formal antidiscrimination policy is relevant to this inquiry, but "it is not sufficient in and of itself to insulate an employer from a punitive damages award. Otherwise, employers would have an incentive to adopt formal policies in order to escape liability for punitive damages, but they would have no incentive to enforce those policies." *Bruso*, 239 F.3d at 858-59 (citation omitted); *see also May v. Chrysler Group, LLC*, 716 F.3d 963, 975 (7th Cir. 2012) (finding that a written anti-harassment policy is relevant to the analysis of good-faith efforts but not alone sufficient); *E.E.O.C. v. Management Hospitality of Racine, Inc.*, 666 F.3d 422, 438 (7th Cir. 2012) (same); *Hall v. Consolidated Freightways Corp. of Del.*, 337 F.3d 669, 675-76 (6th Cir. 2003) (explaining that the employer must actually implement its policy to engage in good faith); *Romano v. U-Haul Intern.*, 233 F.3d 655, 670 (1st Cir. 2000) (concluding that a written non-discrimination policy alone is not sufficient to insulate an employer from punitive damages liability); *Passantino v. Johnson & Johnson Consumer Products, Inc.*, 212 F.3d 493, 517 (9th Cir. 2000) ("[A]n employer must show not only that it has adopted an anti-discrimination policy, but that it has implemented that policy in good faith."). USDC bear the burden to show that it has engaged in good faith efforts to implement an anti-discrimination policy. *AutoZone*, 707 F.3d at 835; *Management Hospitality,* 666 F.3d at 438; *May*, 716 F.3d at 974; *Lampley v. Onyx Acceptance Corp.*, 340 F.3d 478, 482 (7th Cir. 2003).

The evidence viewed in light most favorable to the EEOC shows that USDC did not engage in good faith efforts to implement an anti-discrimination policy. The only undisputed evidence in the record of USDC's good faith efforts is the existence of a Title VII policy in USDC's Employee Handbook ("Handbook"). *See* [Filing No. 56-1 at 7.] The "Equal Employment Opportunity" clause states:

> It is the policy of [USDC] to grant equal employment opportunities to all qualified persons without regard to race, color, religion, age, sex, national origin, ancestry, physical disability, mental disability, medical condition, family care status, veteran status, marital status, or any other basis protected by state or federal law. To deny a qualified person the chance to contribute to our effort is unfair to everyone. It is our intent and desire to provide equal opportunities in employment, training, promotions, wages, benefits, and all other privileges, and terms and conditions of employment. This policy has the support of the highest levels of our management team.[10]

[Filing No. 56-1 at 7.] On April 9, 2011, Mr. Palmer signed an acknowledgment that he received the Handbook, [Filing No. 56-2 at 2,] and he testified during deposition that he received a copy of the Handbook in 2006 when he was first hired and another copy in 2008 when USDC bought Tuchman, [Filing No. 56-6 at 13]. While USDC's policy is relevant to determine whether it engaged in good faith efforts to implement an anti-discrimination policy, it alone is not sufficient. *Bruso*, 239 F.3d at 858-59.

USDC did not introduce additional evidence to meet its burden to show that, beyond having an anti-discrimination policy, it actually enforced its anti-discrimination policy. Mr. Dunn reported that all USDC employees have to undergo some sort of employment discrimination training prior to their first day of work. [Filing No. 56-3 at 7.] He explained: "We have a very comprehensive orientation program with all new employees before they are, or

---

[10] The Handbook also contains a "Policy Against Harassment" clause, which explains that USDC prohibits harassment on the basis of "race, color, religion, age, sex, national origin, ancestry, physical disability, mental disability, medical condition, family care status, veteran status, marital status, or any other basis protected by state or federal law." [Filing No. 56-1 at 8.]

13

right after they are hired that covers all types of discrimination, sexual harassment, everything employees need to know if they are going to work at Tuchman Cleaners . . . ." [Filing No. 56-3 at 7.] Mr. Dunn attended an employment discrimination training session for "managers and above" in 2008 after USDC purchased Tuchman. [Filing No. 56-3 at 7.] Mr. Cvetkovich, Ms. Wentzel, and Mr. Palmer, however, denied receiving any race discrimination training. [Filing No. 57-5 at 5; Filing No. 57-6 at 6; Filing No. 56-6 at 12.] Mr. Cvetkovich speculated that he had probably received materials on employment discrimination matters at some point during his employment with USDC but did not remember what materials specifically. [Filing No. 57-5 at 5.] When asked what type of materials Mr. Cvetkovich has read, he responded: "Just information about how, like, different remarks or different - - you know, saying something could be offensive and discriminative to somebody." [Filing No. 57-5 at 5.] Mr. Cvetkovich was unfamiliar with Title VII of the 1964 Civil Rights Act. [Filing No. 57-5 at 5.] Mr. Palmer stated that Tuchman Zionsville posted notices about employees' Title VII rights in the bathroom. [Filing No. 56-6 at 12.]

Courts have often considered whether an employer offered anti-discrimination training to its employees when determining whether it has engaged in good faith efforts to implement an anti-discrimination policy. In *E.E.O.C. v. Management Hospitality of Racine, Inc.*, the Seventh Circuit found that a rational juror could have concluded that the employer did not engage in good faith to educate its employees about sexual harassment in the workplace. 666 F.3d at 438. The assistant manager testified that she received training on sexual harassment when she was hired as a server and that she was not given any additional training after she was promoted to assistant

14

manager.[11] *Id.* at 438-39. The assistant manager and several other employees failed to report claims of sexual harassment, and the court said that their "consistent failure to comply with the sexual harassment policy evinced a lack of understanding of what constituted sexual harassment . . . and what their responsibilities were as managerial staff under the policy." *Id.* at 439; *see also Bruso*, 239 F.3d at 852, 860-61 (noting that the managers had received "extensive training" from the company's senior litigation counsel on its anti-discrimination policy when deciding whether the company engaged in good faith efforts to implement an anti-discrimination policy); *Ciesielski*, 2004 WL 2997648, *4 (considering the fact that managers attended annual training programs addressing sexual harassment in its "good faith" determination); *Ash v. Tyson Foods, Inc.*, 664 F.3d 883, 905 (11th Cir. 2011) (considering the undisputed evidence that all employees were sufficiently trained on the company's anti-discrimination policy and that management personnel attended yearly training sessions on the company's anti-discrimination policy in its factor three analysis); *Lowery v. Circuit City Stores, Inc.*, 206 F.3d 431, 445-46 (4th Cir. 2000) (taking into account that the company required every manager to attend a week long training seminar that included education in anti-discrimination laws in its factor three analysis). Without evidence of employee training in federal anti-discrimination laws or in the employer's anti-discrimination policy, courts are reluctant to grant summary judgment precluding the issue of punitive damages from reaching the jury. *See E.E.O.C. v. RMG Communications, LLC*, 2009 WL 3569277, *6 (S.D. Ind. 2009) (denying employer's motion for summary judgment, in part, because the employer did not train its employees on race discrimination issues); *Thompson v. Altheimer & Gray*, 2001 WL 1618717, *5 (N.D. Ind. 2001) (same).

---

[11] The court commented: "As [the assistant manager] was in charge of training all new employees on [the employer's] sexual harassment policy, her lack of training is troublesome." *Management Hospitality*, 666 F.3d at 439.

15

Unlike the assistant manager in *Management Hospitality* who had received at least some training on Title VII, Mr. Cvetkovich, Ms. Wentzel, and Mr. Palmer consistently testified that they have received no training in federal anti-discrimination laws or in USDC's anti-discrimination policy. [Filing No. 57-5 at 5; Filing No. 57-6 at 6; Filing No. 56-6 at 12.] The fact that Ms. Wentzel, as Mr. Palmer's manager, did not take appropriate measures to address the "face of Zionsville" comment indicates that she, like the employees in *Management Hospitality*, did not understand race discrimination laws and her role in ensuring USDC was in compliance with anti-discrimination laws. *See* [Filing No. 56-1 at 7-9.]

The court in *Management Hospitality* additionally considered whether the employer had procedures through which employees can report discrimination in its factor three analysis. The court noted that the employees watched a video on sexual harassment. *Management Hospitality, 666 F.3d at 438*. The video was inaccessible to the employees without managerial approval, however, and the complaint mechanism was available only in the video, not in written form. *Id.* The employer hung up a crisis management poster with instructions on how to complain about sexual harassment in the workplace, but the court determined that the poster was an insufficient attempt to provide employees with a meaningful complaint mechanism. *Id.*; *see also Ciesielski, 2004 WL 2997648, *4* (taking into account the company's procedures for addressing harassment complaints as a factor in its good faith efforts analysis). Relatedly, in *Lowery v. Circuit City Stores, Inc.*, the Fourth Circuit noted that that the employer had several formal avenues for employees to complain about race discrimination, but these formal procedures were countered by evidence that employees who did complain felt ignored, intimidated, and feared retaliation. 206 F.3d at 446. It considered this reality when denying the employer's motion to vacate the award

16

of punitive damages for the employer's refusal to promote employees on account of their race. [Id. at 445-46](#).

Similar to the facts in *Management Hospitality* and *Lowery*, USDC's formal complaint mechanism is contradicted by other evidence in the record. Mr. Dunn asserted that he had an open door policy, [[Filing No. 56-3 at 9](#)], yet Mr. Palmer was not aware of Mr. Dunn's involvement in the promotion process until April 2011, let alone his open door policy [[Filing No. 56-6 at 6](#).] Explaining his policy, Mr. Dunn said: "Anybody that wants to come see me anytime can come to see me. The only thing that I require you to do is discuss the problem with your manager first. If you cannot resolve it, feel free to come to me directly." [[Filing No. 56-3 at 9](#).] No one at USDC, including Ms. Wentzel and Mr. Cvetkovich, told Mr. Palmer that he was able to go directly to Mr. Dunn to talk about his interest in being promoted to assistant manager. The "Equal Employment Opportunity" clause in the Handbook contains no complaint mechanism for employees who wish to complain that they are being discriminated against on the basis of race.[12] [[Filing No. 56-1 at 7](#).] Mr. Palmer testified that there is a poster with notices of federal discrimination laws in the Tuchman Zionsville bathroom, but he did not speak to whether the poster outlined a complaint mechanism for violations of one's rights under these laws. [[Filing No. 56-6 at 12](#).]

The Court acknowledges that this case is distinguishable from several cases that have either awarded or denied an award of punitive damages for Title VII because Mr. Palmer did not specifically complain to USDC that he felt discriminated against on the basis of his race when

---

[12] In the Handbook's "Policy Against Harassment" clause, it explains that anyone who "in good faith feels they have been harassed" should report the incident to "Your immediate Manager, or, Your District Manager, or The Administrative Coordinator, or The District President." [[Filing No. 56-1 at 8](#).] It goes on to say that USDC will promptly investigate the incident of harassment and that the employee will not be retaliated against for reporting the incident of harassment. [[Filing No. 56-1 at 9](#).]

17

USDC did not promote him to assistant manager, and USDC did not have an opportunity prior to his EEOC charge to remedy the situation. *See Bruso,* 239 F.3d at 859-861; *May,* 716 F.3d at 974-76; *Management Hospitality,* 666 F.3d at 437-39; *but see Lampley,* 340 F.3d at 482-83.[13] It is USDC's burden, however, to prove this factor in the *Kolstad* framework and to prove that it is entitled to summary judgment on the issue of punitive damages, and it has not met its burden. USDC did take action after Mr. Palmer filed his EEOC charge, but the Court can only consider USDC's efforts before the charge was filed. *David v. Caterpillar, Inc.,* 324 F.3d 851, 865 (7th Cir. 2003) ("[The employer] has cited no authority for the proposition that good deeds taken by the employer after it has made an unlawful employment decision somehow insulate the employer from an award of punitive damages."). The only undisputed fact in the record is the existence of USDC's anti-discrimination policy, which had been repeatedly held to be insufficient to establish a good faith effort to comply with Title VII. Therefore, the first two prongs of the *Kolstad* framework are met, and USDC has failed to show that it has engaged in good faith efforts to implement an anti-discrimination policy.

---

[13] In *Lampley*, the employee felt that he was being discriminated against on the basis of race when his manager refused to promote him, but he did not go through the employer's formal complaint channels. 340 F.3d at 480. Instead, he only confided in a manager from another branch, who told the employee to work things out with his manager. *Id.* at 480-81. The employee filed a charge with the EEOC, and his manager terminated his employment. *Id.* at 481. The district court held a trial on the employee's race discrimination and retaliatory discharge claims for both compensatory and punitive damages. *Id.* at 482. The employer appealed the jury's award of punitive damages for the retaliatory discharge claim, and after going through the *Kolstad* framework, the court concluded that there was sufficient evidence for a reasonably jury to find the punitive damages award for the retaliatory discharge claim. *Id.* at 482-83.

# IV.
## CONCLUSION

For the reasons explained, the Court **DENIES** USDC's Motion for Partial Summary Judgment. [Filing No. 54.]

Distribution:

Kathleen Ann DeLaney
DELANEY & DELANEY LLC
kathleen@delaneylaw.net

Mark J. Plantan
DELANEY & DELANEY LLC
mplantan@delaneylaw.net

Jo Ann Farnsworth
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
joann.farnsworth@eeoc.gov

Aarika D. Mack-Brown
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
aarika.mack-brown@eeoc.gov

Laurie A. Young
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
legal.station@eeoc.gov

Michelle Eisele
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
michelle.eisele@eeoc.gov